# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS
# KANSAS CITY, KANSAS

JAY GIANNUKOS,                       )
                     Petitioner,    )
                                 )
v.                                   )          Case No. 15-CR-20016-DDC
                                 )
UNITED STATES OF AMERICA,            )
                    Respondent.    )

---

## Motion to Vacate and Discharge with Prejudice
## Under 28 U.S.C. 2255 and Memorandum in Support

---

Jay Giannukos moves, under 28 U.S.C. § 2255, to vacate his sentence, to set aside the judgment, and to discharge Petitioner immediately from custody with prejudice to any further prosecution.[1]

## 1.      Introduction

The government violated Petitioner's Fifth Amendment right to due process when it suppressed impeachment evidence relevant to two government witnesses which was material to guilt or punishment.   Additionally, the government violated the Petitioner's Sixth Amendment right to counsel by intentionally and unjustifiably obtaining phone call recordings that included protected attorney-client communications between Petitioner and counsel, saving them until impoundment by this Court, and doing so without actual notice to counsel, the courts, or the Petitioner.  Petitioner requests the Court vacate his judgment with prejudice to refiling.

---

[1] In Standing Order 18-3, the Federal Public Defender was appointed to "represent any defendant from the District of Kansas who may have a post-conviction Sixth Amendment claim based on the recording of in-person attorney-client meetings or attorney-client phone calls by any holding facility housing federal detainees within this District." Undersigned counsel was appointed due to the FPD having a conflict of interest and files this petition pursuant to that authority.

In support of this motion, Petitioner describes below the legal frame work for obtaining relief under 28 U.S.C. §2255, procedural history and facts of Petitioner's case, relevant facts of the *United States v. Black* litigation.  With this pleading and proposed evidence, supplement by the record in *United States v. Black*, Petitioner is entitled to an evidentiary hearing.

2.      **Legal framework**

Under 28 U.S.C. § 2255(a), a prisoner in custody may challenge a conviction or sentence that was imposed in violation of the Constitution or laws of the United States or is otherwise subject to collateral attack.  In the United States the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody.[2]  A person serving a term of supervised release is "in custody" within the meaning of §2255.[3]  If the court finds that the sentence imposed is "open to collateral attack," or that there has been a denial or infringement of the Petitioner's constitutional rights "as to render the judgment vulnerable to collateral attack," the court "shall vacate and set the judgment aside and shall discharge the [petitioner] or resentence him or grant a new trial or correct the sentence as may appear appropriate."[4]

Once a motion is filed under § 2255, a petitioner is entitled to "a prompt hearing" at which the district court is to "determine the issues and make findings of fact and conclusions of law with respect thereto."[5]  The petitioner's burden for establishing an entitlement to an evidentiary hearing is not high; rather, a hearing is mandatory "unless the motion and the files

---

[2] *Jones v. Cunningham*, 371 U.S. 236, 239 (1963).

[3] *United States v. Brown*, 117 F.3d 471, 475 (11th Cir. 1997).

[4] 28 U.S.C. § 2255(b); *see United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996) ("28 U.S.C. § 2255 grants a sentencing court the power to vacate the original sentence and impose a new sentence upon a motion that may be made on a number of grounds.").

[5] 28 U.S.C. § 2255(b).

and records of the case conclusively show that the prisoner is entitled to no relief."[6]

### 3.    Procedural History of Petitioner's Case

On May 13, 2015, a federal grand jury in Kansas returned a four-count superseding indictment against Petitioner.  Petitioner was charged with possession with intent to distribute a quantity of methamphetamine, possession of a firearm in furtherance of a drug crime, unlawful possession of a firearm by a felon, and counterfeiting currency. [7]  Petitioner proceeded to jury trial begin on January 19, 2016.[8]  On January 22, 2016 the jury returned a guilty verdict to all counts charged.[9]  On March 29, 2017 Petitioner was sentenced to a total term of imprisonment of 322 months followed by followed by three years of supervised release.[10]  Petitioner filed a direct appeal to the Tenth Circuit Court of Appeals, on multiple grounds.[11]  On December 4, 2018, the mandate was filed in the district court reversing and remanding for new trial Petitioner's convictions on Counts 2 and 3 of the superseding indictment.[12]

On April 29, 2019, while on remand, Petitioner filed a Motion to Dismiss Indictment, arguing the remaining counts should be dismissed for prosecutorial misconduct based on violation of Petitioner's Fifth and Sixth Amendment rights.[13]  On July 19, 2019, the District Court denied Petitioner's motion to dismiss finding that the issues raised were moot "[w]ithout

---

[6] *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (reversing and remanding where district court erred by not granting petitioner an evidentiary hearing); *see also United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995); *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) ("The burden for establishing an entitlement to an evidentiary hearing is relatively light, and where there is a factual dispute, the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims.") (cleaned up) (emphasis in original).

[7] Doc. 33, Superseding Indictment.  (Unless otherwise stated, citations prefaced with "Doc." Refer to filings in Mr. Giannukos's criminal case, 15-20016-DDC).

[8] Doc 64.

[9] Doc. 70.

[10] Doc. 85.

[11] *United States v. Giannukos*, 908 F.3d 649 (10th Cir. 2018).

[12] Doc. 109.

[13] Doc. 124.

discussing the merits of this argument or commenting on whether prosecutorial misconduct occurred, the court denies defendant's motion to dismiss."  Petitioner also filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33(b)(1) base on the same *Brady* and *Black* grounds raised in the motion to dismiss.[14]  The District Court ultimately denied Petitioner's motion for a new trial as untimely.[15]

On November 5, 2019, the District Court granted the government motion to dismiss Counts 2 and 3 of the superseding indictment.[16]  Sentencing for the remaining counts was held on May 10, 2021 before the Honorable Daniel Crabtree.[17]  Petitioner was sentenced to 108 months followed by three years of supervised release.[18]  Judge Crabtree granted Petitioner a substantial sentence reduction based on a finding that AUSA Morehead engaged in prosecutorial misconduct during the initial prosecution.[19]  At resentencing the district court explicitly did not rely on any facts concerning listening to Petitioner's protected phone calls with counsel in arriving at the variant sentence.[20]

On May 17, 2021 Petitioner filed a timely notice of appeal.[21]  On November 29, 2021 the mandate was entered dismissing the appeal.[22]  On October 7, 2022, Petitioner completed the custodial portion of his sentence and began his term of supervised release.  No previous habeas petitions, applications, or motions were filed with respect to this case.

---

[14] Doc. 143.

[15] Doc. 160.

[16] Doc. 146.

[17] Doc. 197.

[18] Doc. 199.

[19] Doc. 206, 62-64.

[20] Id., 63-64.

[21] Doc. 201.

[22] Doc. 218.

4.      **Relevant facts in Petitioner's Fifth Amendment Claim**

This case involved a search of Petitioner's residence that happened while he was on state parole.[23]  On January 15, 2015, officers went to Petitioner's residence and seized items related to currency counterfeiting, methamphetamine, and two firearms.[24]  At the time of the search of two other individuals were located inside the residence: Ashley Humerickhouse and Johnny Chipps.[25] The government's theory of the case was that Petitioner was distributing methamphetamine and engaging in counterfeiting activities from his residence, and that he possessed the firearms.

At trial the government elicited testimony from only two witnesses regarding methamphetamine distribution by Petitioner: Jeffery Roark and Ashley Humerickhouse.  Ms. Humerickhouse also provided testimony regarding Petitioner's currency counterfeiting activities.

As discussed more fully below, the government withheld material impeachment evidence relevant to both Mr. Roark and Ms. Humerickhouse.  With regard to Mr. Roark, the government suppressed and withheld relevant recorded jail calls that directly contradicted his testimony, materials gathered during an investigation into an apparent suicide attempt by Mr. Roark that contradicted his trial testimony, and relevant criminal history.   With regard to Mr. Humerickhouse, the government suppressed and withheld information regarding threats or promises made by AUSA Morehouse in exchange for her cooperation as a government witness.

A.  <u>**Jeffery "Mike" Roark Trial Testimony**</u>

Mr. Roark testified that he met Petitioner around April of 2014.[26]  Soon after meeting Petitioner, Roark began distributing methamphetamine to Petitioner.[27]  Specifically, Roark

---

[23] Doc. 98 at 7.

[24] Doc. 98 at 34.

[25] Doc. 98 at 30.

[26] Doc. 99 at 176.

[27] Id.

testified that he would typically sell Petitioner a half-ounce or an ounce per week.[28]  On June 30, 2015 Roark was interviewed by Officer Passinese at which time he was specifically asked about Petitioner.[29]  When Roark was first questioned by Officer Passinese, Roark's initial response was the he really did not know Petitioner well.[30]  Later in his interview with law enforcement, Roark told investigators that he sold Petitioner two to four ounces of methamphetamine per week.[31]  At trial, Roark testified that he in fact was friends with Petitioner and that he was selling Petitioner a half ounce to an ounce per week.[32]

1.  Mr. Roark's Undisclosed Recorded Jail Calls

AUSA Morehead questioned Mr. Roark on direct examination regarding the lack of any promises made in exchange for his cooperation.[33]  Mr. Roark testified that he was hoping for some leniency but that nothing had been promised.[34]  During the government's questioning of Mr. Roark, AUSA Morehead specifically highlighted the statutory range of punishment that Mr. Roark was facing as being "not less than ten years and not more than life".[35]  Mr. Roark was asked by AUSA Morehead whether he had a general understanding about how sentencing is arrived at in the federal system.[36]  Mr. Roark testified that "I have a general idea, but me and my lawyer hasn't even discussed that."[37]  AUSA Morehead followed up by asking whether Mr.

---

[28] Doc. 99 at 177.

[29] Doc 99 at 182-83.

[30] Doc. 99 at 184.

[31] Id.

[32] Doc. 99 at 177, 184.

[33] Doc. 99 at 149.

[34] Doc. 99 at 150.

[35] Doc. 99 at 151.

[36] Doc. 99 at 150

[37] Id.

Roark had "any idea where, on the scale of ten to life, where you're actually going to fall?"[38] Mr. Roark replied "[n]o, ma'am."[39]

The USAO possessed and accessed recorded calls made by Mr. Roark which contained impeachment material.  Mr. Roark was housed at Leavenworth CCA leading up to Petitioner's trial.  The USAO obtained the recorded phone calls of Mr. Roark, including calls to attorney Mark Thomason, while he was held in pretrial detention.[40]  The government confirmed that it was in possession of Mr. Roark's recorded CCA phone calls on January 11, 2019.[41]  These and other relevant recorded calls which were in the possession of the USAO were never provided to Petitioner.

Petitioner asserts that all of Mr. Roark's recorded calls are impeachment evidence required to be produced under *Brady v. Maryland*.  More specifically, a call was made on the morning of July 21, 2015, one day before the suicide attempt, by Mr. Roark to his counsel regarding "whether Roark should or should not take a particular action that could impact his case."[42]  Additionally, a call was made by Mr. Roark on December 14, 2015 regarding what type of plea agreement Mr. Roark would be willing to accept.[43]  Then on December 15, 2015, Mr. Roark made a call to discuss legal advice including a plea offer.[44]  These calls, contradict Mr. Roark's testimony that he and his lawyer had not discussed what type of sentence he was facing. These calls further contradict Mr. Roark's testimony about what he was hoping to get in return for his cooperation.

---

[38] Id.

[39] Id.

[40] *In re: CCA Recordings 2255 Litigation*, 19-cv-02491-JAR-JPO, Doc. 182-1, p. 169.

[41] *See United States v. Black*, Case No. 16-20032-JAR, Doc. 711-1, p. 11

[42] *In re: CCA Recordings 2255 Litigation*, 19-cv-02491-JAR, Doc. 182, p. 169

[43] Id.

[44] Id.

### 2. Mr. Roark's Undisclosed Suicide Attempt

On direct examination, AUSA Morehead questioned Mr. Roark regarding "an accident" involving him while housed at CCA.[45]  Mr. Roark testified "I wasn't getting my heart medication for three months, and I blacked out, and the next thing I know, I woke up on the floor."[46]

The government suppressed and failed to disclose materials in its possession, which directly contradicts Mr. Roark's testimony that his fall was due to blacking out.  Specifically, on July 22, 2015 Mr. Roark jumped from the upper tier of the housing unit where he was being held in pretrial detention.  Leavenworth CCA conducted an investigation into the incident, which included collecting Mr. Roark's outgoing phone calls and mail as well as reviewing the PELCO video footage which captured Mr. Roark jumping over the railing.  One of the letters obtained during the institution's investigation revealed that Mr. Roark had written just prior to the suicide attempt that "he was taking the coward's way out."  The investigation concluded that Mr. Roark had intentionally tried to harm himself.  According to CCA internal documents, all of the collected information was forwarded to the facility executive staff as well as the United States Marshal Service (USMS).

### 3. Mr. Roark's Undisclosed Criminal History

At trial the government elicited testimony from Mr. Roark regarding the witness's prior convictions.  Mr. Roark testified that he was convicted in Johnson County District Court of attempted making a false writing.[47]  He also testified that he was convicted of possession of methamphetamine in 2011 in Wyandotte County.[48]  No other prior convictions were elicited by

---

[45] Doc. 99 at 204.

[46] Id.

[47] Doc. 99 at 140.

[48] Id. at 141.

AUSA Morehead on direct examination.

Prior to Mr. Roark's testimony, the government never disclosed to the defense that Mr. Roark had in fact been convicted of multiple counts of possession with intent to distribute methamphetamine and possession of a firearm during a drug trafficking offense.[49]  Mr. Roark was sentenced in the aforementioned case on February 26, 1996 to 120 months.[50]  The government further never disclosed to Petitioner that Mr. Roark had been arrested on August 17, 2011 for theft in Wyandotte County District Court and later convicted.  The government also never disclosed that Mr. Roark had been arrested on December 9, 2011 and charged in Wyandotte County District Court with making a false writing.

### B.  Ashley Humerickhouse's Trial Testimony

On January 21, 2016, Ms. Humerickhouse testified as a witness in the government case-in-chief.  The government elicited testimony from Ms. Humerickhouse in regards to the alleged methamphetamine distribution activities, counterfeit currency, and firearm possession of the Petitioner.  Ms. Humerickhouse testified that she lived with Petitioner and another male (Johnny Chipps) at a residence in Olathe, Kansas for over 6 months beginning in June 2014.[51]  She testified that Petitioner would supply her with personal use quantities of methamphetamine while they were living together.[52]  She further testified that Petitioner would distribute a half ounce to an ounce of methamphetamine a day.[53]  She also testified that she came to learn that Petitioner was involved in counterfeiting money.[54]

---

[49] *See United States v. Roark*, 95-CR-20052-KHV

[50] *United States v. Roark*, 95-CR-20052-KHV, Doc. 54.

[51] Doc. 99 at 49.

[52] Id. at 59.

[53] Id. at 109-10.

[54] Id. at 113.

The government however, failed to disclose material impeachment evidence relevant to Ms. Humerickhouse.  On December 1, 2015, less than two months prior to Ms. Humerickhouse's testimony in Petitioner's trial, she was charged in Johnson County, Kansas with felony passing counterfeit money and misdemeanor theft in relation to an incident that occurred on July 8, 2014.  After being arrested and appearing in court in the Johnson County charges, AUSA Morehead interviewed Ms. Humerickhouse.   The interview was conducted at Ms. Humerickhouse's mother's residence.  According to Ms. Humerickhouse, AUSA Morehead, who took notes during the interview, led her to believe that if she cooperated as a government witness her pending felony charges in Johnson County would be reduced.  Conversely, Ms. Humerickhouse was led to believe that if she did not cooperate with the government she would be charged with additional felonies.   Ultimately, on January 26, 2016, less than a week after testifying as a government witness, Ms. Humerickhouse was allowed to plead guilty to a misdemeanor theft with the felony counterfeit charge being dismissed.

**5.      Petitioner is entitled to an evidentiary hearing and thereafter, to relief for the Fifth-Amendment violation (*Brady v. Maryland*)**

Suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.[55]   A valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense.[56]

**(1)      The Prosecution Suppressed or Withheld Evidence**

The first element under *Brady* requires proof that the prosecution suppressed or withheld

---

[55] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)

[56] *Moore v. Illinois*, 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972)

the evidence in question.[57]  "[T]he term 'suppression,' in the Brady context, does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor."[58]  The prosecutor is the party who is ultimately accountable for the nondisclosure of evidence.[59]  "[T]he 'prosecution' for Brady purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture."[60]  Logically, then, it follows that because investigative officers are part of the prosecution, the taint on the trial is not less if they, rather than the prosecutors, were guilty of nondisclosure.[61]  While proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a *Brady* claim, such proof is by no means necessary.[62]

### a.  Jeffery Roark's Jail Calls, Suicide Attempt, Criminal History

Here there is no question that the prosecution, for *Brady* purposes suppressed or withheld Mr. Roark's recorded jail calls, suicide attempt and criminal history.  Mr. Roark was being prosecuted by another AUSA in the same office as AUSA Morehead.  Mr. Roark's recorded jail calls were requested, obtained and accessed by either the AUSA assigned to Mr. Roark's prosecution or by AUSA Morehead herself.

Similarly, the information and materials related to the investigation into Mr. Roark's suicide attempt were forwarded to the USMS.  These materials related to the investigation into

---

[57] *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995).

[58] *Id.*

[59] *Id.  See Giglio*, 405 U.S. at 154.

[60] *Id.*

[61] *Id.* (*citing Buchanan*, 891 F.2d at 1442) (*quoting United States v. Endicott*, 826 F.2d 454, 455 (9th Cir. 1989)

[62] *Id.*

the suicide attempt and include the recorded jail calls, mail, and video footage.  For *Brady* purposes, these materials were likewise in the possession of the "prosecution team".  "[I]t is impossible to say in good conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence."[63] Interestingly, it appears that the USAO itself does not even know when the materials related to Mr. Roark's suicide attempt came into its physical possession and would therefore be hard pressed to deny the materials were in the government's actual possession at the time of Petitioner's trial.   On the afternoon of June 20, 2019, AUSA Rask, who had entered his appearance in substitution for AUSA Morehead, acknowledged discovering "documents related to the July 22, 2015 incident at CCA" in the government file.[64]   After speaking with other individuals in the U.S. Attorney's Office and review of archive emails, AUSA Rask "was unable to determine when these materials were received by the office and placed in the file."[65]

Finally, regarding the undisclosed prior conviction of Mr. Roark, there is no question that the prosecutor had either actual or constructive knowledge of the of Mr. Roark's 1995 conviction for possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking offense since it was prosecuted by the U.S. Attorney's Office in the District of Kansas.

**b.   Promises or Threats Made by AUSA Morehead to Ashley Humerickhouse**

The notes taken by AUSA Morehead during the interview of Ms. Humerickhouse are obviously in the possession of the prosecution team.  Further, no materials, including the fact that

---

[63] *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001).

[64] Doc. 130 at 1.

[65] *Id.*, at 3.

the interview even took place was ever provided to Petitioner or his trial counsel.

**(2)     The withheld evidence was favorable to Petitioner**

The second element of a *Brady* claim requires proof the evidence in question was exculpatory, or favorable, to the defendant.[66]  The Tenth Circuit and other courts have noted that "because impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*.[67] This is especially true "where a witness' credibility is material to the question of guilt."[68] Impeachment evidence is evidence favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.[69]

Mr. Roark's jail calls directly contradict his trial testimony.  He testified that he had did not have any idea what his presumptive sentence would be within the statutory range of punishment.  He further testified that he had not even had those discussions with this lawyer. However, in Mr. Roark's own petition for post conviction relief and privilege log, he asserts that he in fact did discuss plea offers prior to testifying in Petitioner's trial.  These calls, contradict Mr. Roark's testimony that he and his lawyer had not discussed what type of sentence he was facing.  These calls further contradict Mr. Roark's testimony about what he was hoping to get in return for his cooperation.

The suppressed information and materials related to Mr. Roark's suicide attempt are also favorable to Petitioner.  The materials collected in CCA's investigation into Mr. Roark's suicide

---

[66] *Id*. at 825.

[67] *Id*. (*citing Ballinger*, 3 F.3d at 1376 (quoting Buchanan, 891 F.2d at 1443).

[68] *Fleming*, 19 F. 3d at 1330; *see also Giglio*, 405 U.S. at 154-55.

[69] *Napue v. Illinois*, 360 U.S. 254, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

attempt, including the recorded jail call, mail and security footage are impeachment evidence that could have been used by defense counsel to demonstrate Mr. Roark was not being honest regarding his "accident". This impeachment evidence could be used to not only show the jury that Mr. Roark was deceitful about the circumstances of the "accident" that he testified to under oath when questioned by the government but also provides context regarding his motivation to provide testimony consistent with the government's theory of the case. Mr. Roark's suicide attempt is consistent with the actions of a desperate individual who was willing to say and do anything to avoid the severe penalties he was facing in his own criminal prosecution. Taken together, this impeachment evidence would have greatly impacted how the jury would have viewed Mr. Roark's testimony and is favorable to Petitioner.

Finally, the alleged criminal record of Mr. Roark would have been of value in impeaching his credibility. Importantly, Mr. Roark testified prior to the passing of the First Step Act. At the time of Mr. Roark's testimony, his undisclosed prior conviction in 95-CR-20052-KHV could have been used by the government for the purpose of increasing the statutory minimum sentence in 15-CR-20042-JAR to twenty years.[70] This fact contradicts the potential range of punishment that Mr. Roark had testified to at trial. The potential for increased punishment in the form of a mandatory minimum sentence of twenty (20) years as opposed to ten (10) years provides additional significant incentive for him to testify consistent with the government's theory of prosecution against Petitioner. It could also be used on cross examination to cast doubt on Mr. Roark's testimony no promises or benefits had been made to him by the government in exchange for his testimony.

---

[70] See 21 U.S.C. 841(b)(1)(A)(viii)

Similarly, the withheld evidence that Ms. Humerickhouse had been interviewed by AUSA Morehead and led to believe that her cooperation with the government would help her receive a reduced charge in her pending Johnson County is favorable to Petitioner.

### (3)     The withheld evidence was material

Lastly the Petitioner must show that he suffered prejudice as a result of the failure to disclose.  "[T]he government's suppression of beneficial impeachment evidence affecting the credibility of a key prosecution witness may result in such unfairness as to violate due process."[71]  The failure to disclose *Brady* material need not be "outcome determinative."[72]  As the Supreme Court has explained, "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."[73]  A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial.[74]

It should be noted that the prior inconsistent statements made by Mr. Roark on recorded jail calls could have been admissible extrinsic evidence.  Federal Rule of Evidence 607 states, "Any party, including the party that called the witness, may attack the witness's credibility."[75]  One common method of doing so is to impeach the witness with a prior inconsistent statement made by that witness.[76]  When proof of such a statement goes beyond merely questioning the

---

[71] *United States v. Miller*, 499 F.2d 736, 744 (10th Cir. 1974).

[72] *Smith v. Cain*, 565 U.S. 73, 75-76, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012).

[73] *Cone v. Bell*, 556 U.S. 449, 469-70, 129 S. Ct. 1769, 173 L. Ed. 2D 701 (2009).

[74] *Kyles v. Whitely*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

[75] Fed. R. Evid. 607.

[76] *United States v. Santistevan*, 2012 U.S. Dist. LEXIS 95632 (D. Colo. 2012).

testifying witness and, therefore, involves the use of extrinsic evidence, FRE 613 is the controlling rule.[77]   It provides, in pertinent part: "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."[78]

Here, Mr. Roark denied discussing with his counsel what his possible sentence may be or had engaged in plea discussions.  If defense counsel had Mr. Roark's jail calls, for instance, he could have asked Mr. Roark whether he had in fact discussed his possible sentence or plea negotiations on December 14, 2015.  After being allowed an opportunity to review the content of the call, Mr. Roark would either have to admit to the statement contained in jail call, in which case the call would not be admitted.  If Mr. Roark chose instead to persist in his denial, the calls themselves would be admissible under the rules of evidence.  Either way, the jury would have the benefit of a clearer understanding not only the veracity of Mr. Roark but also his motivations for testifying in a consistent manner with the government's theory of the case.

The same can be said regarding Mr. Roark's suicide attempt.  Had defense counsel had been provided with the CCA investigative materials, Mr. Roark could have been asked on direct examination whether he was placed on suicide watch after his self describe "accident."  Mr. Roark could have been asked whether he had written letters prior to his accident indicating that he was intending to harm himself.  Similarly, defense counsel could have asked Mr. Roark if he had made any calls prior to his "accident" indicating that he was contemplating self harm.  Mr. Roark could either admit or deny these statements.  If he admits these statements, then the extrinsic evidence would not be admitted into evidence.  However, the jury would be left with

---

[77] *Id.*

[78] *Id.*

the suggestion that Mr. Roark's testimony on direct that he simply blackout and fell was far from true.  Further, if Mr. Roark denied those statements, the extrinsic evidence would be presented to the jury.  Either way, the jury would be able to conclude that Mr. Roark was not being truthful and that he was in an emotional state whereby he would be willing to say and do anything to avoid the penalties he was facing in his own criminal case.

Similarly, Roark's undisclosed prior serious drug conviction for possession with intent to distribute methamphetamine is relevant to the bargain that he had struck with the government. Mr. Roark's prior federal drug conviction could have been used by the government for purposes of increasing his mandatory minimum sentence from ten years to twenty years.  The increase penalty would be additional impeachment evidence to support the conclusion that Mr. Roark was facing an extremely lengthy sentence and the only option in his mind was suicide or saying what the government wanted him to say at trial.

Likewise, the withheld evidence that Ms. Humerickhouse had been interviewed by AUSA Morehead and led to believe that her cooperation with the government would help her receive a reduced charge in her pending Johnson County.  This is the type of "small piece of evidence" that may "create just the doubt that prevents the jury from returning a verdict of guilt."[79]

**6.      Petitioner is entitled to an evidentiary hearing and thereafter, to relief
for the Sixth-Amendment violation**

Petitioner can establish that the government violated Petitioner's Sixth Amendment rights when it obtained three recorded calls between Petitioner and his attorney.  Facts derived from the investigations in *Black* and related cases as well as the facts developed at an evidentiary hearing in this matter, will demonstrate that the government intentionally obtained phone calls of

---

[79] *Smith v. Secretary of N.M Dep't of Corrections*, 50 F.3d 801, 834 (10th Cir. 1995) (citing *Bagley*, 473 U.S. at 693 (Marshall, J., dissenting); (*see also Robinson*, 39 F.3d at 1119).

confidential attorney-client communications. In turn, the government cannot establish that any legitimate law-enforcement purpose justified it doing so. Under *Shillinger*, that alone is sufficient to establish a *per se* Sixth Amendment violation. The Tenth Circuit has made clear in *Shillinger v. Haworth* that once these factors are established, "a prejudicial effect on the reliability of the trial process must be presumed."[80]  In *Shillinger*,[81] the Tenth Circuit held that a *per se* Sixth Amendment violation occurs where (1) there are confidential attorney-client communications, (2) the government intruded into those communications, (3) the government's intrusion was intentional, and (4) the intrusion was not justified by any legitimate law-enforcement interest.[82]

    (1) <u>United States v. Black investigation</u>

Petitioner seeks relief, in part, based on events that came to light in *United States v. Black* case and investigation, including the existence of audio recordings of telephone conversations between attorneys and their clients who were detained at a private detention facility, CCA, in Leavenworth, Kansas.[83]  During the summer of 2016, it came to light that the United States Attorney's Office (USAO) for the District of Kansas had obtained video recordings of privileged and protected attorney-client in-person communications that took place at a private detention facility, CCA, in Leavenworth, Kansas. It was also discovered that the USAO had routinely obtained CCA recorded attorney-client phone calls, and that it did so without notice to the attorneys, clients, or courts. Rather than disclose or divest the recordings, however, the USAO

---

[80] 70 F.3d at 1142 (holding that no "case-by-case inquiry into prejudice" is necessary because "such intentional and groundless prosecutorial intrusions are never harmless"); *see also id*. at 1141 (citing *Perry v. Leeke*, 488 U.S. 272, 279-80 (1989) (stating that the Supreme Court has 'expressly noted that direct government interference with the right to counsel is a different matter' with regard to whether prejudice must be shown)).

[81] 70 F.3d 1132, 1142 (10th Cir. 1995).

[82] *See also United States v. Levy*, 577 F.2d 200, 210 (3d. Cir. 1978).

[83] *United States v. Black, et. al*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, petitioners' Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been remained to CoreCivic.  For convenience, Petitioner refers to CCA in this Motion.

maintained and at times redistributed these recordings to other entities. Some recordings of attorney-client phone calls in the USAO's possession dated back to at least 2011.[84]

Once notified of the video and audio recordings, The Honorable Julie Robinson ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls[85]; (2) the video and audio recordings in USAO custody to be impounded[86]; and (3) the government to preserve its computer hard drives.[87] By October 11, 2016, a Special Master had been appointed to assist the Court's investigation into matters related to the government's conduct.[88]

On August 13, 2019 after numerous hearings and extensive briefing by the parties, the Court issued its Findings of Facts and Conclusions of Law, which detailed the government's practice of obtaining attorney-client communications and its view that these communications are not protected, and whether the "preamble" language that played at the beginning of the Securus telephone calls constituted a waiver of the attorney-client privilege.[89]  The Order discussed the elements required to prove a *per se* violation of the Sixth Amendment under the Tenth Circuit decision in *Shillinger v. Haworth*,[90] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the

---

[84] *Id.*

[85] *Black*, Doc. 253 at 3.

[86] *Id.*, at 3 & 12 ("The Court [] issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[87] *Id.* at 40.  At the September 7, 2016, hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives.").

[88] *Black*, Doc. 146 (Appointment Order); *see also Black,* Doc. 253 Order at 4.

[89] *Black*, Doc. 758 at 101-06.  (*Black* Order).

[90] 70 F.3d 1132 (10th Cir. 1995).

attorney-client communication because of it's intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[91]  Once those elements are established, prejudice is presumed.[92]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[93]  The Court determined that the following threshold showings must be made: (1) the telephone recording exists, and (2) a given call contains protected attorney-client communication, i.e., communication that relates to legal advice or strategy sought by the client.[94]

(2) Relevant facts in Petitioner's Sixth Amendment Claim

The evidence will show that the government intentionally procured and possessed recorded phone calls of confidential communications that took place between Petitioner and his attorney while Petitioner was confined at CCA.   More specifically, to date, counsel's investigation have revealed that (1) at least three attorney-client phone call by Petitioner to his then attorney, Ms. Ramsey, were accessed by the government; (2) on at least three separate occasions AUSA Morehead requested Petitioner's CCA recorded phone conversations; (3) on July 17, 2015 AUSA Morehead was informed that as of that date Petitioner was no longer able to make calls to anyone except his lawyer; (4) on July 20, 2015 AUSA Morehead, despite knowing that Petitioner could only call his lawyer, requested the recorded phone calls of Petitioner including calls made from July 17, 2015 through July 20, 2015; (5) Petitioner's recorded calls remained in the possession of the government until July 2021; and (6) AUSA Morehead accessed

---

[91] *Black* Order at 101-06.

[92] Id. If the government has a legitimate law enforcement purpose for its intrusion, however, the per se rule does not apply and a defendant would have to show proof of prejudice.  Id. at 155.

[93] Id. at 163.

[94] Id. at 166.

at least one of Petitioner's recorded calls as recently as the week prior to July 13, 2021.[95]

Petitioner further asserts that on April 28, 2015 he called his attorney three times for the purpose of discussing trial defense and strategy.  Petitioner further asserts that it was his custom and practice to call his attorney repeatedly until he was able to successfully make contact with his counsel.  Petitioner further attests that on one of the April 28, 2015 calls, he if fact was able to make contact with Ms. Ramsey and discuss trial defense and strategy.

On July 13, 2021, for the first time, AUSA Morehead informed the U.S. Attorney that she was aware there were jail calls recordings present in the discovery area of the USAO network related to Petitioner.[96]  On July 14, 2021, the USAO Systems Manager was directed to download the "Jail Calls" folder onto a flash drive and to then delete the folder and contents from the USAO network.[97]  There are only two audio files related to calls to attorney Ramsey on the produced flash drive.  However, the call records from Securus indicate that there were a total of three calls made to attorney Ramsey on April 28, 2015.  It appears, therefore, that there is a missing audio file that captured the attorney-client call that is the basis of this claim.

(3) <u>The remedy for the government's per se Sixth Amendment violation is dismissal</u>

Given that Petitioner will establish a *per se* Sixth Amendment violation and that prejudice must be presumed, the Court must then determine what remedy is appropriate under the circumstances. The Tenth Circuit's opinion in *Shillinger* is instructive in this regard, as well. There, the Tenth Circuit held that as the "pervasive[ness]" of the government intrusion into attorney-client communications increases, so too does the remedy necessary to purge the taint of

---

[95] *Black* Doc. 855 at 2 & n.2.

[96] *Black*, Doc. 855.

[97] *Black*, Doc. 855 at 4-5.

the intrusion.[98]   Indeed, "dismissal of the indictment could, in extreme circumstances, be appropriate."[99]

When it comes to such extreme sanctions, the Tenth Circuit has also made clear that it is within a district court's "broad discretion" to fashion the relief necessary to deter the offending party's future misconduct.[100]  In *King v. Fleming*, for example, a § 1983 action, the plaintiffs materially altered an email from a Kansas State Court Judge, and attached the email to an "unauthorized complaint,"[101] which the district court relied on to grant plaintiffs leave to amend their complaint.[102]  Once privy to the fact that plaintiffs had presented a "fraudulent version" of the email, however, the district court granted a motion for sanctions, dismissing the compliant with prejudice to all claims and awarding attorney's fees and costs.[103]  Specifically, the district court found that that plaintiffs' counsel "failed to make a reasonable inquiry into the manipulated document and also failed to respond reasonably when confronted with the fact that the email had been altered."[104]  On appeal, after walking through its five-prong sanctions analysis (set forth below), the Tenth Circuit affirmed, holding that the "district court didn't abuse its 'broad discretion' in determining that dismissal, rather than a lesser sanction, was appropriate" since the

---

[98] *Shillinger*, 70 F.3d at 1143.

[99] *Id.*; *see also Committee for Public Counsel Services v. Attorney General*, 108 N.E.3d 966 (Mass. 2018) (holding that, in the wake of a lab scandal calling into question the testing results of thousands of criminal cases, "[t]he government misconduct by [the technician] and the assistant attorneys general [who hid the misconduct] was 'so intentional and so egregious'" that "the very strong medicine of dismissal with prejudice" was required).

[100] *King v. Fleming*, 899 F.3d 1140, 1153-54 (10th Cir. 2018); *Shillinger*, 70 F.3d at 1143; *see also Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992) ("A federal court is vested with 'the largest power to control and direct the form of judgment to be entered in cases brought up before it on *habeas corpus*.") (quoting *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968)); *id.* ("a federal court 'possesses power to grant *any form of relief necessary* to satisfy the requirement of justice'") (emphasis in original)).

[101] *Fleming*, 899 F.3d at 1144-46.

[102] *Id.*

[103] *Id.* at 1146-47.

[104] *Id.* at 1146.

record "supported the need for an unforgiving sanction to deter future misconduct."[105]

In the habeas context, too, the Tenth Circuit has held that in "extreme circumstances" permanent discharge of a defendant with prejudice to deter future misconduct is within the court's inherent authority.[106] And both the Supreme Court and the Tenth Circuit have contemplated dismissal as a remedy for extreme government intrusions into Sixth Amendment protected attorney-client communications.[107] The Supreme Court has instructed that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[108] In *King*, the Tenth Circuit reiterated five "non-exhaustive factors" as an appropriate "roadmap to use in considering a dismissal-with-prejudice sanction":

> (1) the degree of actual prejudice to the defendant caused by the misconduct; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the litigant in advance that dismissal of the action would be a likely sanction for noncompliance"; and (5) the efficacy of lesser sanctions.[109]

This test has been used "in resolving a variety of analogous violations," under the Federal

---

[105] *Id.* at 1153-54.

[106] *Shillinger*, 70 F.3d at 1143; *see also Burton*, 975 F.2d at 693 (a district court possesses the "authority to permanently discharge a successful petitioner in a habeas corpus case where it deems such a remedy appropriate") (emphasis in original) (quoting *Levy v. Dillon*, 415 F.2d 1263, 1265 (10th Cir. 1969)).

[107] *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981) (suggesting that "a pattern of recurring violations by investigative officers . . . might warrant the imposition of a more extreme remedy in order to deter further lawlessness"); *Shillinger*, 70 F.3d at 1143; *see also Burton*, 975 F.2d at 693 (a district court possesses the "authority to permanently discharge a successful petitioner in a habeas corpus case where it deems such a remedy appropriate") (emphasis in original) (quoting *Levy v. Dillon*, 415 F.2d 1263, 1265 (10th Cir. 1969)).

[107] *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981) (suggesting that "a pattern of recurring violations by investigative officers . . . might warrant the imposition of a more extreme remedy in order to deter further lawlessness"); *Shillinger*, 70 F.3d at 1143 (as the ive[ness]" of the government intrusion into attorney-client communications increases, so too does the remedy necessary to purge the taint of the intrusion and to deter the government's misconduct, such that "dismissal of the indictment could, in extreme circumstances, be appropriate").

[108] *Morrison*, 449 U.S. at 364.

[109] *King*, 899 F.3d at 1150.

Rules of Civil Procedure "as well as under the court's inherent powers."[110]  It is suitable here because it addresses both the injury suffered and competing interests, as required by *Morrison*.

### (1)    The degree of actual prejudice as a result of the misconduct

As set forth above, Tenth Circuit precedent establishes that "a prejudicial effect on the reliability of the trial process must be presumed" where the government intentionally intrudes into confidential attorney-client communications without a legitimate law-enforcement purpose justifying it doing so.[111] As a result, a court need not consider this factor to determine the proper remedy for this Sixth Amendment violation.

### (2)    Interference with the judicial process

The government's conduct in response to the district court's investigations in *United States v. Black* has interfered substantially with the judicial process.[112] The damage done by the government's Sixth Amendment violations is extensive and systemic. Such violations necessarily undermine attorney-client trust and taint the adversarial system.[113] The government's Sixth Amendment and other misconduct has also exacerbated the "culture of mistrust" that the Special Master identified early on within the District of Kansas, undermining the defense bar's— not to mention the criminally accused's—trust in plea negotiations and other processes necessary

---

[110] *Id*.

[111] *Shillinger*, 70 F.3d at 1142 (holding that no "case-by-case inquiry into prejudice" is necessary because "such intentional and groundless prosecutorial intrusions are never harmless"); *see also id*. at 1141 (citing *Perry v. Leeke*, 488 U.S. 272, 279-80 (1989) (stating that the Supreme Court has 'expressly noted that direct government interference with the right to counsel is a different matter' with regard to whether prejudice must be shown)).

[112] *See, e.g., Black, et. al*, 16-20032-JAR, D.E. 253 Order at 22, 29; D.E. 372 (Order denying Government's motion to terminate Phase III of the investigations); D.E. 571 (Order Reconvening Evidentiary Hearing) (noting that "[d]espite the fact that the Court and all parties had agreed that the evidentiary hearing was recessed (but not concluded) . . . , the government objected to the motion to reconvene."); D.E. 694 (Tr. 11/16/18, Vol. 10) at 2794:19-2799:12 (the Court opined during the November 16, 2018 hearing, that there have been "a number of problems with the way the [government's] production has happened mechanically and otherwise for two years this has been going on, and for two years we've gotten almost nowhere."); D.E. 690 (Final Production and Briefing Order detailing government's conduct).

[113] *See Black*, D.E. 686 (Amicus Brief of Ethics Bureau at Yale).

to the federal justice system.

Similarly there has been damage to the public's trust in our criminal justice system.  It has long been understood that the government's interest "is not that it shall win a case, but that justice shall be done."[114]  The public's interest lies in the integrity of the system. That system, and thereby the public's trust in it, has waned as a result of the government's misconduct.[115]

The damage done also includes the significant litigation time that has been required to address the government's misconduct.[116] The years spent litigating this matter thus far have not only required the expenditure of extraordinary time and resources,[117] but also delayed relief for a large number of eligible defendants, including Petitioner.

The delay created by the government's unwillingness to fully cooperate with this Court's

---

[114] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[115] *See, e.g.,* Dan Margolies, *A Federal Prosecutor Listened to Multiple Attorney- Client Phone Calls, Evidence Shows*, KCUR (Oct. 12, 2018), archived at https://perma.cc/B734-Q5AC ("The U.S. Attorney's Office has denied that it accessed attorney-client recordings except in a couple of isolated instances, which it says were inadvertent. But documents produced in response to a subpoena by David R. Cohen, the special master appointed by Robinson, showed that former federal prosecutor Tanya Treadway listened in on more than a dozen attorney-client calls in one case alone."); Editorial Board, *Why were private attorney-client calls recorded? Now, Kansas inmates could go free*, THE KANSAS CITY STAR (June 11, 2018), archived at https://perma.cc/3GMK-277N ("And here's a question for the U.S. attorney's office of Kansas: Why did some of its attorneys listen to those supposedly private conversations? Certainly the lawyers knew that such conversations were off- limits and that they had no business eavesdropping on them."); Dahlia Lithwick, *Leavenworth's Spygate*, SLATE (Aug. 23, 2016), archived at https://perma.cc/Q4N2- FYTD ("The federal prosecutors in the Leavenworth case have taken the position that any special master investigation will be costly and lengthy (there are hours of tapes) and that there is simply no evidence that any wrongdoing has happened.

Perhaps the greatest worry for those concerned with civil liberties is the fact that CCA seems to have taken the 'everybody does it' defense to mean that it did nothing wrong."); *see also* NYTimes Editorial Board, *Federal Prosecutors Need a Watchdog, Too*, NYTIMES (Dec. 25, 2018), archived at https://perma.cc/7XXD-RZKV (discussing public mistrust of federal prosecutors based on the fact that, because of a quirk in the Inspector General Act of 1978, federal prosecutors are not subject to the same oversight and accountability as other government agencies).

[116] *King*, 899 F.3d at 1151 (prejudice from plaintiff's misconduct included fact that "[d]efendants have also been required to spend time and resources" addressing the misconduct); *Xyngular*, 890 F.3d at 874 (prejudice found where litigant's misconduct "led the parties to expend significant time and resources resolving the issue").

[117] By way of example, since his appointment in October 2016 to the date of this filing, the Special Master has received over $713,000 in compensation for his work on this matter, *see Black*, D.E. Orders 173, 185, 189, 195, 274, 283, 284, 294, 297,

356, 397, 426, 468, 494, 507, 575, 614, 647, 691, 707, which represents only a small fraction of the total resources spent thus far on this investigation.

orders and the Special Master is particularly relevant to Petitioner who has served the entirety of his sentence and has been placed on supervised release beginning on October 7, 2022.

### (3)    Culpability of the government

The government's culpability is at least twofold. First, it violated the Sixth Amendment rights of a host of criminal defendants. Second, it obstructed the district court's investigation into those violations. These acts were not limited to one or two prosecutors; these acts, including acts of obstruction, permeated, and continue to permeate the USAO for the District and Kansas. These facts all support a remedy of dismissal with prejudice.[118]

### (4)    Whether the government was on notice

The government knew it obtained attorney-client communications and took no precaution to avoid doing so. Further, it remained deliberately ignorant of the process by which calls were recorded. Its research on the matter was inept and inaccurate.[119]   Then, because the government in *Black* never sought the district court's advice about the propriety of obtaining or returning attorney-client communications, the defense never had an opportunity to object and the district court did not have an opportunity to determine whether the USAO's unilateral determination that CCA inmates had waived privilege or confidentiality by speaking with counsel over the phone was correct. Hiding misconduct cannot defeat the notice requirement.

Furthermore, the Tenth Circuit does not require a prior warning when sanctions are for

---

[118] *King*, 899 F.3d at 1153 ("Submitting an altered document to a court is deceitful. And not retracting that manipulation when presented with evidence of its falsehood is doubly so. Thus the district court didn't abuse its discretion in finding King's, Muathe's, and Ogunmeno's conduct culpable, bolstering its decision to apply a dismissal sanction."); *Burton*, 975 F.2d at 693 ("a federal court 'possesses power to grant *any form of relief necessary* to satisfy the requirement of justice") (emphasis in original).

[119] *See, e.g., Black*, D.E. 669, Tr. 10/02/18, Vol. 3 at 616:10-629:04 (testimony of Erin Tomasic); D.E. 672 Tr. 10/04/18, Vol. 5 at 1179:23-1190:03 (testimony of AUSA Dave Zabel); D.E. 677 Tr. 10/12/18, Vol. 9 at 2380:16-2381:25 (testimony of AUSA Debra Barnett); D.E. 694 Tr. 11/16/18, Vol. 10 at 2635:18-2636:13 (testimony of former acting U.S. Attorney for the District of Kansas Thomas Beal).

pre-litigation conduct.[120] And the government was more than adequately warned about the district court's expectations in *Black* with respect to the district court's investigation into the government's Sixth Amendment violations.[121]

(5)   **Insufficiency of lesser sanctions**

Sanctions should be designed to deter and punish misconduct. The government's conduct since its Sixth Amendment violations were discovered itself suggests the insufficiency of lesser sanctions. An unforgiving sanction is necessary to deter future misconduct, both with respect to the sanctity of attorney-client communications and the need to honor the Court's inquiries and orders.[122]

7.   **Conclusion**

From the beginning, the government has gone to great lengths to hide both its intrusions into confidential attorney-client communications and its intent in doing so—including refusing to cooperate with the district court's Sixth Amendment investigation in *Black* and destroying evidence "critical" to this Court's determinations in Petitioner's case, in addition to the hundreds of other petitioners whose rights have been violated by this misconduct.[123] However, here Petitioner's circumstances are more egregious than most and demonstrates how the USOA

---

[120] *Xyngular*, 890 F.3d at 874-75.

[121] *See, e.g.,* D.E. 690 (Final Production and Briefing Order detailing government's conduct).

[122] *See, e.g.,* Cynthia E. Jones, *Here Comes the Judge: A Model for Judicial Oversight and Regulation of the Brady Disclosure Duty*, 46 Hofstra L. Rev. 87, 129-31 (2017) ("Courts must . . . hold prosecutors accountable when the actions of the prosecutor result in the denial of constitutional rights and undermine the effectiveness of the judicial process."); *see also* NY Times Editorial Board, *Federal Prosecutors Need a Watchdog, Too*, NY TIMES (Dec. 25, 2018), *supra* fn. 54.

[123] *See Black, et. al*, Case No. 16-20032-JAR, D.E. 253 at 25-40 ("Memorandum and Order Directing Phase III Investigation") (finding that the USAO "was able to produce all of the hardware except for one computer, that is, the very computer used

. . . to play the video recordings. That computer had not been preserved. Instead, its hard drive had been wiped clean. Needless to say, this precluded the Special Master from examining and analyzing the one computer that could have provided meta data and information revelatory of when video recordings were played, perhaps by whom, and perhaps what video recordings were played. This critical evidence has been destroyed despite the Court's order").

practice of unilaterally obtaining recorded jail calls of defendants, including attorney-client calls, without providing notice of those recordings, can and has violate a defendant's Fifth Amendment right to *Brady* material and also the defendant's Sixth Amendment right to competent counsel. Petitioner's case presents the "extreme circumstances" in which dismissal with prejudice is not only appropriate but also necessary.[124]  For these reasons, Petitioner asks the Court to order the government to respond within 30 days, to grant an evidentiary hearing, and, after hearing evidence and argument, to vacate Petitioner's judgment, with immediate dismissal and prejudice to any further prosecution.

If this Court does not grant relief, Petitioner requests a certificate of appealability (COA) as to each claim raised in Petitioner's § 2255 Motion.[125] To be entitled to a COA, Petitioner must "make a substantial showing of the denial of a constitutional right."[126] But this is a "light burden."[127] Petitioner need only show that "his appeal points are reasonably debatable"[128] for this Court to issue a COA.[129] Because reasonable jurists could disagree with any denial of Petitioner's claims, a certificate of appealability is appropriate in the event this Court denies relief.

---

[124] *Shillinger*. 70 F.3d at 1142-43.

[125] 28 U.S.C. § 2253(c)(1)(B).

[126] 28 U.S.C. § 2255(c)(2).

[127] *Wilson v. Bryant*, 655 Fed. Appx. 636, 641 (10th Cir. 2016); *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (a prisoner need only show "something more than the absence of frivolity"); *accord Buck v. Davis*, 137 S.Ct. 759, 773-75 (2017) (the standard for issuing a COA "is not coextensive with a merits analysis").

[128] *Wilson*, 655 Fed. Appx. at 641; *see also Miller-El*, 537 U.S. at 338 ("We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.").

[129] Where a § 2255 motion is dismissed on procedural grounds without reaching the underlying merits, a prisoner must show two things: (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right"; and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**Petitioner's Verification**

I declare (or certify, verify, or state) under penalty of perjury that the contents of this filing are

true and correct.

Executed on this 22nd day of November 2022.

giannukosjay@gmail.com

Jay Giannukos (Movant/Petitioner)


Respectfully submitted,

/s/ *David J. Guastello*
David J. Guastello, KS #22525
811 Grand Blvd., Suite 101
Kansas City, Missouri 64106
(816) 753-7171
david@guastellolaw.com
Attorney for Petitioner

<u>CERTIFICATE OF SERVICE</u>

I certify that on 11/28/2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

<u>s/ *David J. Guastello*</u>
David J. Guastello, KS#22525